# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

JOHN DOE, also known as "HOLLIS LNU,"
a bald, light-skinned black man, age 35-40,
with a thin moustache and a medium build,
using a cellular telephone with the assigned
telephone number (773) 425-5334

**FILED**
MAY - 7 2003
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**CRIMINAL COMPLAINT**

CASE NUMBER: **03CR0470**

MAGISTRATE JUDGE NOLAN

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From on or about __February 25, 2003, to on or about May 7, 2003,__ in __Cook County__, in the __Northern__ District of __Illinois__ defendant,

conspired to distribute, and dispense, and possess with intent to manufacture, distribute, and dispense, controlled substances, namely heroin,

in violation of Title __21__ United States Code, Sections __841(a)(1) and 846__.

I further state that I am a __Task Force Agent with the United States Drug Enforcement Administration__ and that this complaint is based on the following facts:

See attached affidavit

Continued on the attached sheet and made a part hereof: __X__ Yes ___ No

Signature of Complainant
DONN KAMINSKI
TASK FORCE AGENT WITH THE UNITED STATES
DRUG ENFORCEMENT ADMINISTRATION

Sworn to before me and subscribed in my presence,

May 7, 2003 at
Date

Chicago, Illinois
City and State

NAN R. NOLAN, Jr., U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF COOK       )

## AFFIDAVIT

I, Donn Kaminski, being duly sworn on oath, state as follows:

## INTRODUCTION

1. I am a Task Force Officer with the Drug Enforcement Administration (DEA), United States Department of Justice. I am currently assigned to the DEA Chicago Field Division, and have been so assigned for approximately 3 years. I have been employed by the Braidwood, Illinois, Police Department for approximately 13 years. I have been a sergeant with the Braidwood Police Department for approximately 5 years. In connection with my official duties, I investigate criminal violations of federal statutes, including violations of Title 21, United States Code, Sections 841, 843 and 846 (controlled substance violations). I have received specialized training in the enforcement of federal narcotics laws, and I have been involved in all aspects of narcotics trafficking investigations, including: (a) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from drug trafficking; (b) surveillance; and (c) analysis of documentary and physical evidence. I have also testified in judicial proceedings and prosecutions for violations of federal narcotics laws. Based on my training and experience as a law enforcement officer, I am familiar with the ways

in which narcotics dealers conduct their drug-related business, including, but not limited to, their use of code words to identify themselves, the nature of the communication and/or to conduct their transactions.

2. Based upon my training and experience, the training and experience of other agents with whom I have consulted, and my participation in other financial investigations involving large amounts of controlled substances, I know:

(a) That drug traffickers and individuals who launder narcotics proceeds very often place assets in names other than their own to avoid detection of these assets by government agencies;

(b) That even though these assets are in other persons' names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them;

(c) That large-scale narcotics traffickers generally maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;

(d) That narcotics traffickers and individuals who launder narcotics proceeds maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That narcotics traffickers commonly "front" (provide narcotics on

consignment) narcotics to their clients; that the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the traffickers and individuals who launder narcotics proceeds have ready access to them;

(e) That when drug traffickers amass large proceeds from the sale of drugs that the drug traffickers attempt to legitimize these profits. That to accomplish these goals, drug traffickers and individuals assisting them utilize domestic and international banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, vehicles, and business fronts;

(f) That persons involved in large-scale drug trafficking commonly conceal in their residences large amounts of currency, financial instructions, precious metals, jewelry, and other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, concealing, secreting, or the spending of large sums of money made from engaging in narcotics trafficking activities, including bank statements, safe deposit keys, and other records related to the receipt, expenditure and concealment or other disposition of income;

(g) That drug traffickers and individuals who assist in laundering narcotics proceeds commonly maintain addresses or telephone numbers in books, electronic organizers, or papers, which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

3

(h)  That drug traffickers frequently have in their possession and at their residences drug paraphernalia, including scales, cutting supplies, and packaging;

(i)  That drug traffickers take or cause to be taken photographs of them, their associates, their property, and their product. That these traffickers usually maintain these photographs in their possession;

(j)  That I am aware that courts have recognized that unexplained wealth is probative evidence of crimes involving narcotics trafficking; and

(k)  That based on my training and experience, that drug traffickers commonly have in their possession, that is on their person, at their residences and/or their businesses, firearms, which are used to protect and secure a drug trafficker's property.

3.  As a result of my personal participation in this investigation, and my review of: (a) (a) interceptions of court-authorized wire communications; (b) various public records; (c) telephone record information; (d) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, and (e) information obtained from witnesses, including cooperating witnesses and cooperating sources I am familiar with all aspects of this investigation.

## PURPOSE OF AFFIDAVIT

4.  This affidavit is submitted in support of (A) a complaint for the arrest of John Doe, also known as "HOLLIS LNU," a bald, light-skinned black man, age 35-40, with a thin

4

moustache and a medium build, using a cellular telephone with the assigned telephone number (773) 425-5334, as well as (B) for a warrant to search Apartment #3A at 11501 Villa Court, Alsip, Illinois ("**the subject premises**"), occupied by ABIOLA RABIU, where there is probable cause to believe that documents, objects and other items evidencing violations of Title 21, United States Code, Sections 841 and 846 exist. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a warrant to search **the subject premises**, I have not included each and every fact known to me and other law enforcement agents concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of a search warrant.

## SUMMARY OF FACTS ESTABLISHING PROBABLE CAUSE

5. On February 24, 2003, Acting Chief Judge James F. Holderman, United Stated District Court, Northern District of Illinois signed an order authorizing the interception of wire communication over **Target Phone Six**. **Target Phone Six** is a cellular telephone utilized by AKIN MARTINS.

### *MONTGOMERY Orders Heroin From MARTINS*

6. On February 25, 2003, at approximately 9:33 p.m., MARTINS received an incoming on **Target Phone Six** (Call #22) from 773-418-4811. The telephone conversation was between MARTINS and a man subsequently identified as Brian

5

MONTGOMERY. During the call, MARTINS stated, "I'm just come over there and see what you want."[1] MONTGOMERY then stated, "Just come like you came before." MARTINS replied, "Oh like I came before. Alright." [Your Affiant believes that during this call MONTGOMERY told MARTINS that he wanted the same amount of heroin that he previously received.]

7.   Later that day, at approximately 9:36 p.m., MARTINS made an outgoing call (Call #24) to **Target Phone Seven** (the interception of which was authorized by Chief Judge Charles P. Kocoras on April 1, 2003). This telephone conversation was between MARTINS and Abiola RABIU (identified as the principal user of **Target Phone Seven**). During the call, MARTINS asked if RABIU had "gone there." RABIU then told MARTINS to "forget about it." [Your Affiant believes that during this call, MARTINS called RABIU to see if RABIU was at **the subject premises** so that MARTINS could obtain the heroin for MONTGOMERY.]

8.   Later, at approximately 10:29 p.m., MARTINS made an outgoing call (Call #28) to MONTGOMERY. During the call, MARTINS stated, "It's gonna be tomorrow." MONTGOMERY then asked, "What time?" MARTINS then told MONTGOMERY to call him tomorrow around "twelve, one." [Your Affiant believes

---

[1] Most of the conversations contained herein were originally in Yoruba (Nigerian). The conversations are rough translations, as well as rough summaries of the intercepted conversations.

6

that during this call MARTINS told MONTGOMERY that they could do the deal the next day.]

### *ADEBIYI Also Orders Heroin from MARTINS*

9. The next day, on February 26, 2003, at approximately 10:28 a.m., MARTINS received an incoming call (Call #34) from 773-301-4640. The telephone conversation was between MARTINS and a man subsequently identified as GBADEBO ADEBIYI. During the call, ADEBIYI asked, "Can I speak to Akin?" MARTINS then asked, "Who's this?" ADEBIYI replied, "Gbadebo." MARTINS later stated, "I told him about the three, but he said it's money on the ground. That's what he told me." ADEBIYI then asked, "For everything?" ADEBIYI later asked, "How many do you think?" MARTINS then stated, "Give me a few minutes to call you back right now. I want to talk with him." [Your Affiant believes that during this call, MARTINS told ADEBIYI that he was instructed that ADEBIYI must provide all of the money up front before MARTINS could sell him any heroin.]

### *MARTINS Delivers the Heroin to MONTGOMERY and ADEBIYI*

10. Later that day, at approximately 11:40 a.m., surveillance units observed a blue colored Honda Accord bearing Illinois license plates 2370205, parked in the area of 8430 S. Vernon Chicago, Illinois. A records check confirmed that this vehicle is registered to Akin MARTINS. Surveillance was maintained on the vehicle. At

approximately 1:22 p.m., surveillance units observed MARTINS exit the residence, enter his vehicle, and depart the area. At approximately 1:26 p.m., surveillance of the vehicle was lost in the vicinity of Interstate 94 and 87th Street in Chicago, Illinois.

11.  On February 26, 2003, at approximately 1:36 p.m., MARTINS made an outgoing call (Call #46) to ADEBIYI. During the call, MARTINS stated, "I have spoken to the person, they said it is going to be ready around four and they can only get one. So I want to know how you going to do it, if you will be interested or not." ADEBIYI then asked, "Can he give us one and half." MARTINS later stated, "Let me phone guy because know all this people right now. But let me phone my guy. If I can't come with you, I will come with one and half or something like that." [Your Affiant believes that during this call, MARTINS told ADEBIYI that he could get "one" meaning one hundred grams of heroin and that he would have to check with his source of supply to see if he could supply ADEBIYI with one hundred and fifty grams of heroin.]

12.  On February 26, 2003, at approximately 1:39 p.m., MARTINS made an outgoing call (Call #48) to MONTGOMERY. During the call, MARTINS left a voice mail for MONTGOMERY stating, "I spoke to the guy though, he hold me it's gonna be around four though so call me up if you still wanna, still wanna do it okay."

13.  On February 26, 2003, at approximately 1:44 p.m., MARTINS received an

incoming call (Call #52) from MONTGOMERY. During the call, MARTINS stated, "I just got over here though. I got to wait 'till around four o'clock. So once it's four o'clock, I'll just be coming over there. They said they are waiting for someone." [Your Affiant believes that during this call, MARTINS told MONTGOMERY that he is waiting for the heroin at **the subject premises**, and that once he had the heroin, he would deliver it to MONTGOMERY.]

14. At approximately 2:54 p.m., surveillance units re-located MARTINS' vehicle parked at the Crestline Apartments in Alsip, Illinois. The vehicle was parked in the area of **the subject premises**. At approximately 3:40 p.m., MARTINS exited the apartment building with an unknown female and entered RABIU's green-colored Toyota Camry. Subsequent records checks confirmed that the vehicle is registered to ABIOLA RABIU at 10114 Pulaski Oak Lawn, Illinois. The associated Illinois driver's license indicates that the registered owner of the vehicle is ABIOLA BOLAJI, who purportedly resides at **the subject premises**. The mailbox at **the subject premises** has the name "ABIOLA BOLAJI RABIU."

15. On February 26, 2003, at approximately 4:25 p.m., MARTINS made an outgoing call (Call #63) to ADEBIYI. During the call, MARTINS stated, "I am looking at it now. It remains one. It remains a little time for it to be okay." MARTINS later stated, "He can get you one." ADEBIYI then asked, "That one is

9

seven isn't it?" MARTINS then stated, "Yeah." MARTINS later stated, "He said he's expecting another thing to him or something like that, is what is happening. So I still can't tell, but he said that the one is available now has all been done and that some people are coming to get it." [Your Affiant believes that during this call, MARTINS told ADEBIYI that he could supply him with 100 grams of heroin and not the 150 that ADEBIYI requested. MARTINS further related that he was at the location where they were preparing the heroin.]

16. On February 26, 2003, at approximately 5:50 p.m., MARTINS made an outgoing call (Call #74) to MONTGOMERY. During the call, MARTINS stated, "I'm ready for you. You want me to come through?" MONTGOMERY then stated, "Yeah come on there."

17. On February 26, 2003, at approximately 6:06 p.m., surveillance units observed MARTINS and unknown black male exit the apartment building and depart the area in the RABIU's vehicle. Surveillance was maintained on the vehicle.

18. On February 26, 2003, at approximately 6:27 p.m., MARTINS made an outgoing call (Call #77) to 773-418-4811. The telephone conversation was between MARTINS and MONTGOMERY. During the call, MARTINS told MONTGOMERY that he was downstairs.

19. On February 26, 2003, at approximately 6:35 p.m., surveillance units

10

observed MARTINS park in the area of 6943 S. Aberdeen Chicago, Illinois. MARTINS subsequently entered the second floor apartment of 6936/6938 Aberdeen. At approximately 6:58 p.m., surveillance units observed MARTINS exit the building and depart the area in his vehicle. Surveillance was maintained on MARTINS. Shortly thereafter, three subjects exited the second floor apartment of 6936/6938 Aberdeen and departed the area in a Buick bearing Illinois license plates 3470718. At approximately 7:10 p.m., the Chicago Police Department conducted a vehicle stop of the Buick based on the intercepted phone calls. At that time, the occupants of the vehicle were identified as MONTGOMERY, Jankia Brooks, and Izokpu Olusegun. The vehicle was subsequently searched with negative results for contraband. At approximately 7:32 p.m., surveillance units observed MARTINS and the unknown male arrive back at **the subject premises**.

20. On February 26, 2003, at approximately 7:55 p.m., surveillance units observed MARTINS depart the area of **the subject premises** in his blue-colored Honda. Surveillance was maintained on the vehicle.

21. On February 26, 2003, at approximately 8:16 p.m., MARTINS made an outgoing call (Call #103) to ADEBIYI. During the call, MARTINS stated, "I have reached the place." ADEBIYI then stated, "I will meet you right now."

22. On February 26, 2003, at approximately 8:20 p.m., surveillance units observed

11

MARTINS park his vehicle in the area of 55th Street and Everett in Chicago, Illinois. At that time, the passenger of a Toyota Solaro, bearing Illinois license plates T763939, exited that vehicle and entered MARTINS' vehicle. Shortly thereafter, the unknown male exited MARTINS' vehicle and returned to the Toyota Solaro. At approximately 8:35 p.m., MARTINS departed the area in his vehicle.

23. At approximately 8:37 p.m., MARTINS made an outgoing call (Call #106) to 773-425-5334. During the call, MARTINS received an incoming call from 773-220-3688. The telephone conversations were between MARTINS, RABIU and a man subsequently identified as HOLLIS LNU. During the call, MARTINS told HOLLIS LNU, "Everything went smooth. I will soon be coming home." MARTINS then switched to the call waiting, at which time RABIU asked, "Are you okay?" MARTINS replied, "I am okay." MARTINS then switched back to the original call. HOLLIS LNU then stated, "Watch your back as you drive." MARTINS then stated, "It's the way you drive. It's the way you taught me to drive that I drive." HOLLIS LNU later stated, "Always watch your back. They will not follow you." HOLLIS LNU later asked, "What about Biola?" MARTINS then replied, "He called me just now. He was the one that called me that time." [Your Affiant believes that during this call, MARTINS reported to HOLLIS LNU and to RABIU that the two heroin transactions to MONTGOMERY and ADEBIYI "went smooth," and that he was returning to

12

HOLLIS LNU's location, namely, **the subject premises**. MARTINS also identified the caller of the 773- 220-3688 as "Biola", who is believed to be Abiola RABIU.]

### *100 Grams of Heroin Seized from ADEBIYI*

24. On February 26, 2003, at approximately 8:40 p.m., members of the Chicago Police Department approached the Toyota Solaro that was still parked at 55th Street and Everett. At that time the occupants of the vehicle were identified as GBADEBO ADEBIYI and Segun Adeniyi. The vehicle was then searched as a result of the intercepted phone calls. The search resulted in the seizure of approximately 100 grams of heroin from the center console area of the vehicle. Both subjects were released without charges. [Your affiant believes that, based on the information set forth above, the 100 grams of heroin were kept at **the subject premises**.]

### *Drug Courier at the Subject Premises*

25. On or about May 1, 2003, Acting Chief Judge James B. Zagel authorized the interception of telephone calls on **Target Phone Eight** (utilized by HOLLIS LNU). On or about May 7, 2003, HOLLIS LNU received two telephone calls (calls #448 & 465) from a man who identified himself as "Teddy." During those call, Teddy informed HOLLIS LNU that an individual subsequently identified as FREDERICK WINFIELD was not feeling well, and that Teddy wanted to take WINFIELD to a

13

doctor or hospital. HOLLIS LNU spoke directly to WINFIELD and asked whether "those things in your body have come down?" WINFIELD responded that "everything has come down," but that he still was feeling ill. HOLLIS and Teddy also discussed possible "problems" that could arise from taking WINFIELD to the hospital. [Your Affiant believes that WINFIELD and HOLLIS are discussing balloons of heroin that WINFIELD had ingested in order to smuggle them into the country, and that HOLLIS and Teddy LNU were concerned that hospital personnel may contact law enforcement if they discover that WINFIELD had ingested amounts of heroin.]

26. At approximately 1:00 p.m. on May 7, 2003, surveillance units at **the subject premises** observed three individuals exit 11501 Villa Court, which encompasses **the subject premises**, and enter RABIU's Toyota Camry parked near **the subject premises**. Surveillance observed the vehicle drive to Cook County Hospital. Two men subsequently left in RABIU's Toyota Camry. The vehicle was subsequently stopped pursuant to a routine traffic stop, and one of the men in the vehicle was identified as THEODORE FABRICK. WINFIELD was not in the vehicle. [Your Affiant believes that these symptoms are consistent with WINFIELD's previous ingestion of heroin, that WINFIELD checked himself in to the Cook County Hospital because he in fact ingested heroin, and that WINFIELD passed some or all of the heroin at **the subject premises**.]

14

## PREMISES TO BE SEARCHED

27. A public records check performed on or about March 1, 2003, indicated that the subject premises contained no occupants.

## NATURE OF THE EVIDENCE TO BE SEIZED

28. Based on my training, experience, and the participation in drug trafficking investigations involving the concealment of drug profits and assets by drug dealers to prevent detection by federal government agencies, I have observed that

a. Individuals involved in drug trafficking generate large amounts of currency from their sales. Drug dealers use the currency to purchase additional illegal drugs and legitimate personal items such as cars, real estate, clothing, jewelry, etc.

b. Drug dealers employ various methods to conceal their spending of these illegally obtained funds. One of the most common methods of concealment is the use of legitimately employed relatives or friends of the drug trafficker to act as "nominees" or "straw owners." These people agree to conduct transactions, often times utilizing fictitious identification, on behalf of the drug dealer to masquerade as the owner of personal or real property. The drug dealer concludes that police inquiries will be minimal and seizure of the property will not occur, when the legitimately employed nominee is identified as the listed owner of the property.

c. All large-scale drug traffickers must maintain large amounts of United States

15

currency on hand in order to finance their ongoing drug business. This currency is usually kept in a "safe" house or their residence.

d. Drug traffickers maintain books, receipts, notes, ledgers, and other records reflecting the ordering, sale, distribution quantities, and monies owed for drug sales, and that such records are frequently maintained at a narcotics trafficker's place of residence or location where the drug trafficker has immediate access to the records.

e. Drug traffickers commonly "front" (provide on consignment) controlled substances to their customers and the aforementioned books, records, receipts, notes, ledgers, etc, of these transactions are maintained frequently in their residences or "front" businesses. They further frequently possess photographs or videos of themselves with their criminal associates.

f. It is very common for large-scale drug traffickers to secrete drugs, the proceeds of drug sales and records of drug transactions in secure locations within their residences, for ready access and to conceal them from law enforcement authorities. In order to accomplish this concealment, drug dealers will often build "stash" places within their residences.

g. Persons involved in large scale drug trafficking also conceal in their residences financial instruments, precious metals, jewelry and other items of value which

16

constitute the proceeds of drug trafficking, as well as records which reflect the purchase, sale, or other transactions involving such assets, such as motor vehicle records, money orders, or wire transfer receipts.

h. When drug traffickers amass large proceeds from the sale of drugs, they attempt to legitimize these profits. To accomplish these goals, drug traffickers frequently invest in legitimate businesses in an attempt to provide them with a "front" operation to make it appear their wealth was legitimately obtained.

i. Drug traffickers commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or telephone numbers of their associates in the drug trafficking organization.

j. Drug traffickers frequently use pagers or "beepers" to facilitate communications and use public telephones to avoid electronic surveillance.

k. Drug traffickers usually keep paraphernalia for packaging, cutting, weighing and distributing drugs in their residence or businesses. This paraphernalia includes scales, plastic bags and cutting agents.

l. It is very common for large-scale drug traffickers to maintain more than one residence within which the trafficker would store his instruments of the trade. Multiple residences are kept the idea that if one location is compromised the trafficker can continue to conduct his business from one of the other locations.

m. I am aware that the federal courts recognize that unexplained wealth is probative evidence of crimes motivated by greed and, in particular, trafficking in controlled substances.

n. Based on my training and experience, I have also learned that individuals involved in narcotics trafficking often maintain in their residences and garages safes, safe deposit boxes, storage lockers, and hidden compartments in which they attempt to hide proceeds, invoices, checks, and other documentation related to their fraudulent schemes. Individuals involved in narcotics transactions further frequently use pagers, electronic organizers, cellular and wireless telephones, and answering machines to communicate with their criminal associates and to store contact and other information related to their criminal enterprises. Your affiant therefore requests permission to open, search, and, if necessary, remove, any safe or other locked receptacle or compartment, in which some or all of the items hereto described may be maintained, and to access and search any pagers, electronic organizers, cellular and wireless telephones, answering machines, and answering machine tapes, and the contents therein.

27. Based on the foregoing, there is probable cause to believe that the property listed in Attachment B is evidence of the commission of violations of Title 21, United States Code, Sections 841, 843, and 846, and that this property will be located

18

within the subject premises.

FURTHER AFFIANT SAYETH NOT

*[signature]*

Donn Kaminski
Task Force Officer
Drug Enforcement Administration

SUBSCRIBED and SWORN to before me
this th day of May, 2003

*[signature]*

NAN R. NOLAN
Magistrate Judge
United States District Court

19